UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**TAMARA OGIER**, *as bankruptcy trustee*
*for* **DIANNE** *and* **HEBER PAMPILLON**,
*and* **COURTNEY PAMPILLON**,
*Individually*,

   Plaintiffs,
v.               **COMPLAINT**

**THE AMERICAN NATIONAL RED CROSS**,
2025 East Street Washington, D.C.,

**AMERICAN RED CROSS BLOOD SERVICES,**
**SOUTHERN REGION,**
9851 Commerce Way, Douglasville, Georgia,

**MELISSA DORWROTH,**
9851 Commerce Way, Douglasville, Georgia,

and

**DENISE BAPTISTE,**
9851 Commerce Way, Douglasville, Georgia,

   Defendants.
_____/

## INTRODUCTION

On behalf of Dianne and Heber Pampillon, bankruptcy trustee Tamara Ogier brings this medical malpractice action for the Pampillon's and their minor child to secure redress from injuries received from misfeasance and malfeasance suffered at the hands of defendants on July 5th, 2013 when Dianne Papillon donated blood at an event in Marietta, Georgia. Dianne

Papillion's damages include temporary and permanent neurological injuries that include loss of function to her body, resulting extreme and constant pain, lost income and enjoyment of life.

Plaintiff Courtney Marie Pampillon, daughter of Dianne and Heber Pampillon, has reached majority during the pendency of litigation. She is therefore separately listed as a Plaintiff to bring her claims for damages, including for loss of consortium with her mother.

This claim was previously voluntarily dismissed by order of the Court on June 29th, 2017 in 1:15-CV-2395-TCB. The matter is being refiled with in six months as permitted by law.

## VENUE AND JURISDICTION

**1.**

This action is brought pursuant to 28 U.S.C. §1441, and the specific grant of federal jurisdiction for the American Red Cross to be sued in Federal Court. See 36 U.S.C. §2.

**2.**

The American National Red Cross is corporate entity created by Act of Congress that has offices and/or an officer at 2025 East Street Washington, D.C. This Defendant is a joint tort feasor and, once served, will be subject to the jurisdiction of this Court. Service on this Defendant may be made by serving an officer of The American National Red Cross.

**3.**

Defendant American Red Cross Blood Services, Southern Region is a corporation or other entity created by The American National Red Cross to further its blood collection and distribution services. Defendant American Red Cross Blood Services, Southern Region, transacts

business, has offices and/or an officer at 9851 Commerce Way, Douglasville, Douglas County, Georgia 30135.  This Defendant is a joint tort feasor and, once served, will be subject to the jurisdiction of this Court. Service on Defendant American Red Cross Blood Services, Southern Region may be made by serving its CEO, Jerry J. K. Tillery, or his successor.

**4.**

Defendant Melissa Dorwroth is a joint tort feasor and, once served, will be subject to the jurisdiction of this Court.

**5.**

Defendant Denise Baptiste is a joint tort feasor and, once served, will be subject to the jurisdiction of this Court.

**6.**

Venue is proper in the Jurisdiction.

**7.**

At all times material hereto the Pampillon's were residents of Cherokee County, Georgia. Dianne Pampillon and Heber Pampillon are the custodial parents of their minor child Devan Ryan Pampillon, and are sui juris.  Pamela Ogier is the lawful representative of Dianne Pampillon and Heber Pampillon as their bankruptcy trustee in Case 14-54340-wlh, United States Bankruptcy Court, Northern District of Georgia, Atlanta Division.

**8.**

The American National Red Cross is the parent company of various organizations including American Red Cross Blood Services, Southern Region, a/k/a Blood Services of The American Red Cross, Southern Region.  The American National Red Cross, together with American Red Cross Blood Services, Southern Region, and other organizations, do business as "American Red Cross" to further the purposes of The American National Red Cross and are jointly referred to herein as "ARC".

**9.**

Defendants Melissa Dorwroth and Denise Baptiste were, at the time they drew Ms. Pampillon's blood, employees acting as phlebotomists for ARC. At all material times they were agents, servants, employees and/or representatives of ARC. They were acting within the course and scope of such relationship and with the permission, consent and ratification of ARC. ARC is thus responsible for the misfeasance and malfeasance of Defendants Dorwroth and Baptiste under the legal principle of respondeat superior.

**10.**

Pursuant to agreement of the parties, all claims are merged so that the sole defendant for all purposes of this action is The American National Red Cross.

**COUNT I - NEGLIGENCE**

**11.**

Plaintiffs attach as Exhibit "A" the O.C.G.A. § 9-11-9.1(a) Affidavit of Malpractice and Medical Narrative as given by Dr. Bernard R. Drexinger, Jr., M.D. and adopts the facts, statements and conclusions of Dr. Drexinger as if specifically set forth herein. Plaintiffs give notice of intent to rely on and use the above narrative at trial pursuant to OCGA § 24-3-18.

12.

Plaintiffs attach as Exhibits "B" and "C" the O.C.G.A. § 9-11-9.1(a) Affidavits of Malpractice as given by Billie Walsh and adopts the facts, statements and conclusions of Nurse Walsh as if specifically set forth herein.

13.

On July 5, 2013 Dianne Pampillon donated blood in Marietta, Georgia to ARC at an ARC event on an ARC bus. Her first phlebotomist during the donation was Defendant Dorwroth. After Dorwroth failed in her attempt to draw blood, Dorwroth called upon Defendant Baptiste to get the needle inserted into the vein of the antecubital fossa of Dianne's right arm just above where the median nerve would typically be.

14.

Defendant Baptiste pulled the needle up so it was just below the skin and used a forceful twisting and turning motion to jam the needle into the vein. Dianne Pampillon immediately lifted her shoulders off the table complaining, "Oh my God that hurts." Baptiste then laid Dianne down then walked away. Dianne complained of electrical shock like pain during and after that

final manipulation of the needle, was in and complained of severe pain throughout the rest of the donation.

## 15.

At that site of needle insertion it could impale the median nerve. The median nerve runs inside the antecubital fossa and passes through the forearm into the palm of the hand. When clinicians are drawing blood from the antecubital fossa or inserting peripheral IV devices, it is common knowledge and training they could contact the nerve and that contact could injure this nerve. Further, that the longer the needle is left in or on the nerve, the greater damage is likely.

## 16.

Despite Dianne Pampillon's complaints of too much pressure, electrical sensation and numbing of her fingers, Defendants Dorwroth and Baptiste continued the donation.

## 17.

Dianne was left for extensive periods without being monitored. At one point her blood bag was discovered to have become cold because she was not dripping.

## 18.

When Dorwroth attempted to remove the needle it felt as though it was stuck in the vein to both Dorwroth and Dianne. Dianne again sat up and complained. Both had concern that the needle had broken and that a piece of the needle remained in Dianne's arm. The removal of the needle from Dianne's arm caused pain as bad as or greater than the insertion.

**19.**

While all of Dianne's friends had finished their donation in 15 to 20 minutes, Dianne's donation took over an hour.

**20.**

Among other misfeasance and malfeasance, Dorwroth and Baptiste breached standards of care owed Dianne Pampillon as phlebotomists and were negligent in treatment of Dianne by their:

   a.  Failure to use a superficial vein when inserting the needle/catheter deep into the arm where nerves lie just beneath the veins;

   b.  Failure to exercise ordinary care when inserting the needle by using excessive force, pressure, and twisting and turning motions to force the needle into the vein;

   c.  Failure to address Mrs. Pampillon's pain/discomfort by not removing the needle/catheter when made aware of her symptoms of nerve damage;

   d.  Failure to properly supervise the blood donation by assessing the donor and puncture site every 30 seconds and leaving Dianne unsupervised during the procedure;

   e.  Failure to release the "tourniquet" or blood pressure cuff after two minutes;

   f.  Failure to properly evaluate the Plaintiff's condition after the donation;

   g.  Failure to advise Dianne of the gravity of her situation and necessity for to see a neurologist for treatment;

   h.  Failure to provide proper care and treatment for the Dianne's resulting condition on site and after her injuries became apparent, and;

   i.  Upon information and belief, failing to follow the ARC's guidelines, protocols and practices for blood donations.

**21.**

Each of the aforesaid acts of negligence constituted a contributory cause and /or was the proximate cause of injury to Dianne Pampillon and resulting damages to the Plaintiffs.

**22.**

Dianne Pampillon contacted ARC on a Saturday, the day after the donation, because she was having pain and difficulty performing her job as a dog groomer. At that time, her veins in the right forearm were raised and darkened. She talked to an ARC representative (Dianne recalls the representative's name as "Lillian"), who stated that it sounded like "the phlebotomists were up against a valve and that this is why no blood came through, that the phlebotomists then backed up and pushed through nerve and valve, and that had the phlebotomists backed up "a tad" from the valve they would have gotten blood."

**23.**

ARC representative Lillian explained a hematoma, the pain, swelling, darkening and raising of the veins. The representative advised to alternate between icing and warm compresses, use ibuprophen and that it would probably take three to four weeks to heal. ARC representative Lillian knew, but failed to advise Dianne, of the urgency of her condition and that she should seek immediate medical treatment from a neurologist.

**24.**

To this day, Ms. Pampillon's veins present much larger in her right forearm than her left. There is discoloration of the right arm, asymmetric "pruning" or wrinkling of her hands, less nail grown on the right and they are yellowish in color.  She has had sparse hair growth in her right forearm. She has complained of temperature differences between one arm and the other to the point where the skin on her right arm gets "goose bumps".  She has complained of a mottled and cold hand and forearm, hypersensitivity to temperature changes, excessive nail and hair growth, and the inability to lift objects.  Despite her youth, she immediately entered menopause because of the injury. She also suffers from light-headedness because of the damage done to her body's ability to maintain blood pressure.

**25.**

Dr. Drexinger has diagnosed Ms. Pampillon with reflex sympathetic dystrophy (RSD) and went on to state in his affidavit "if a patient complains of an electric shock type sensation radiating down into his or her hand as the needle is being inserted, the appropriate intervention is to remove the needle immediately. The outcome will be less likely to have permanent injury; however, if the clinician continues to advance the needle farther into or on the nerve, permanent nerve damage is far more likely.  A permanent, progressive, and painful disability resulting in RSD or complex regional pain syndrome (CRPS) can result. The longer the needle stays in the greater neurologic damage that can be done if the needle is on or through the nerve. The neurologic damage is much the same as the protective insulating sheathing to an electrical wire being punctured, cut or sheared. Such would expose the now unprotected wire to electrical shorting and failure."

**26.**

Dr. Drexinger went on to state in his affidavit and medical narrative: "The standard of care for an antecubital blood draw is thus to immediately remove the needle and try a different site or different day in the event of severe pain, in particular, the electrical shock feeling. I know this standard of care through my training and experience as a neurologist and believe that the standard of care was breached in taking Ms. Papillion's blood by manipulating and not removing the needle upon Ms. Papillion's complaints. Further, that the manipulation of the needle, and/or the leaving of the needle in, directly resulted in RSD / CRPS from which Ms. Pampillon now suffers."

**27.**

Dianne Pampillon's condition demonstrates CRPS by meeting "The Budapest Criteria" used to diagnose CRPS as her medical record reflects:

A: Continuing pain which is disproportionate to the inciting event;

B: At least one sign in two or more of the below categories;

C: She reports at least one symptom in three or more of the below categories; and

D: No other diagnosis can better explain the signs and symptoms.

- Sensory: Allodynia (to light touch and/or temperature sensation and/or deep somatic pressure and/or joint movement) and/or hyperalgesia (to pinprick);

- Vasomotor: Temperature asymmetry (more than 1 deg.) (of note is "Exhibit D" attached being the medical record from a Ganglion Stellgate Block treatment at The Physician's Spine & Rehab Specialists of Georgia demonstrating temperature asymmetry by showing

at 9:12 a.m. Dianne's right hand temperature was 32.3 and left hand was 31.0, at 9:31 a.m. Dianne's right hand temperature was 29.9 and left hand was 28.3, and at 9:53 a.m. Dianne's right hand temperature was 30.0 and left hand was 28.6.) and/or skin color changes and/or skin color asymmetry;

- Sudomotor/oedema: Oedema and/or sweating changes and/or sweating asymmetry; and/or

- Motor/trophic: Decreased range of motion and/or motor dysfunction (weakness, tremor, dystonia) and/or trophic changes (hair/nail/skin).

### 28.

Dianne Pampillon will incur substantial medical expenses over the rest of her life expectancy for which she is entitled to be compensated.

### 29.

Dianne Pampillon was a talented and award winning dog groomer prior to the subject before blood donation. Due to the severe and permanent injury to her right arm and hand, Dianne has and will continue to incur substantially diminished income for she is entitled to be compensated.

### COUNT II – GROSS NEGLIGENCE

### 30.

Plaintiffs set forth this Count II and re-allege each of the previous paragraphs as if individually set forth herein.

**31.**

The large blood drawing needle is designed to be inserted in a straight line action. Defendant Baptiste was grossly negligent by driving the needle into the vein using a twisting motion. That motion literally replicated a drill bit in the trauma she caused the vein and median nerve of Dianne Pampillon. Dianne expressly recalls Baptiste acting annoyed that she was brought over to assist Dorwroth, never introducing herself, being very abrupt in her actions, never asking Dianne if she was alright or apologizing, just walking off.

**32.**

Dorworth and Baptiste were grossly negligent in not objectively treating Dianne Pampillon by removing the needle upon her complaints, allowing the needle to remain despite the known likelihood of nerve damage in continuing the blood draw.

**33.**

The Defendants were grossly negligent in not advising Plaintiff of the gravity of her situation and making sure she immediately got treatment with a neurologist once her injury became apparent.

**34.**

The Defendants were grossly negligent in not using vein finding technology that would have assisted Dorwroth and Baptiste is safely inserting the needle.

**35.**

The Defendants were grossly negligent in not using a butterfly needle that would not have damaged the median nerve or caused only minimal damage if it had hit the median nerve.

## COUNT III – PUNATIVE DAMAGES

**36.**

Plaintiffs set forth this Count III and re-allege each of the previous paragraphs as if individually set forth herein.

**37.**

The Defendants misfeasance and malfeasance, as set forth in Counts I & II, particularly when viewed with all other facts in this matter, shows a level of willful misconduct, wantonness, oppression, or that entire want of care raising the presumption of conscious indifference to consequences so as to authorize punitive damages.

**38.**

Such conscious indifference authorizes the jury to award Plaintiffs their costs of court and reasonable attorney's fees pursuant to O.C.G.A. § 51-12-7.

## COUNT IV – LOSS OF CONSORTIUM

**39.**

Plaintiffs set forth this Count IV and re-allege each of the previous paragraphs as if individually set forth herein.

**40.**

Plaintiffs should recover for the loss of consortium of Dianne Pampillon as caused by the Defendants and shown by the evidence.

**DEMAND FOR RELIEF**

**WHEREFORE**, the Court should enter judgment in favor of Plaintiffs and against Defendants for:

(1) Such general and special damages as found by the enlightened conscience of the jury pursuant O.C.G.A. Section 51-12-2 and other applicable law;

(2) Such direct and consequential damages as found by the enlightened conscience of the jury pursuant O.C.G.A. Section 51-12-3 and other applicable law;

(3) Punitive damages as found by the enlightened conscience of the jury pursuant to OCGA § 51–12–5.1(f) and other applicable law;

(4) Necessary expenses consequent upon injury may be included in estimate of damages as found by the enlightened conscience of the jury pursuant O.C.G.A. Section 51-12-7 and other applicable law;

(5) That Defendant ARC be held vicariously liable for the misfeasance and/or malfeasance of Defendants Dorwroth and Baptiste;

(6) That there be a finding of joint and several liability between the Defendants;

(7) That appropriate Plaintiffs should recover for the loss of consortium of Dianne Pampillon;

(8) All costs of litigation, together with reasonable attorney's fees; and

(9) A trial by jury and such other and further relief as the Court deems proper.

Respectfully Submitted:

*Elmore Putney*
/x/ E. Martin Putney, III

_____

E. Martin Putney, III
Georgia Bar No. 590370
Email: martin@putneylawfirm.com

Reset Lawyers, LLC
281D Young Harris Street
PMB 157
Blairsville, GA 30512
404-438-5551

*Attorney for Plaintiffs*